HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LANA SHEPARD,

        Plaintiff,

        v.

DONALD C. WINTER, Secretary of the U.S. Navy,

        Defendant.

Case No. C06-5463 RBL

ORDER

     This matter comes before the court on Defendant's Motion to Dismiss and/or for Summary Judgment. The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

## I. BACKGROUND

     Plaintiff in this employment discrimination action, Lana Shepard, is a Caucasian woman formerly employed at the Bremerton Naval Hospital ("the Hospital") located in Bremerton, Washington. Ms. Shepard began her employment with the Hospital as a Medical Assistant in 1990 and performed a variety of clerical duties. In 1994, Ms. Shepard began having problems with her hands and was subsequently diagnosed with bilateral carpel tunnel syndrome ("BCTS"); she underwent corrective surgery on both of her hands in 1995 [Dkt. #15-4, pp. 88-92].

     After a brief stint in the private sector in 1997, Ms. Shepard returned to the Hospital in 1998 to work as a Medical Support Assistant in the General Surgery department. Ms. Shepard apparently

ORDER
Page - 1

had some recurrent problems with BCTS upon return to the Hospital, and in 2000 some modifications were made to her workstation in response [Dkt. # 15-4, p. 40]. However, for the most part, Ms. Shepard was tolerating work well in General Surgery [Dkt. #15-4, p. 111].

While employed in General Surgery, Mr. Shepard was directly supervised by the lead nurse, Linda Ungren [Dkt. #15-1, p. 6]. Ms. Ungren's management style and treatment of Ms. Shepard was apparently coarse, and in July 2003, Ms. Shepard filed a claim with the Department of Labor's Office of Worker's Compensation (OWCP) alleging a stress-related disability stemming from a hostile work environment [Dkt. #9-3, p. 14].[1] Ms. Shepard also filed an EEO complaint in September 2003 based on "stress and harrassment [sic] over last 5 years" [Dkt. #15-1, p. 27]. Under a heading on the EEO intake form entitled "STATE THE CORRECTIVE ACTION DESIRED," Ms. Shepard listed "re-assignment" [*Id.* at 28].

Ms. Shepard's OWCP claim prompted the Hospital's Commanding Officer, Captain William Roberts, to order an investigation into the hostile work environment allegations [Dkt. #9-3, p. 17]. Completed on September 24, 2003, the investigation revealed significant problems with the working relationship between Ms. Shepard and Ms. Ungren and faulted both sides for creating a "mean-spirited, stressful work environment" [Dkt. #9-3, p. 26]. Based on these findings, Captain Roberts tasked the Hospital's Human Resource Supervisor, Robert Hickman, with reassigning Ms. Shepard, so long as she was amenable to the new location [Dkt. #9-3, pp. 2-3]. Ms. Shepard was also actively seeking a transfer. Indeed, in November and December of 2003, Ms. Shepard applied for at least four positions but was apparently unsuccessful in securing a transfer [Dkt. #15-1, p. 2].

At some point in the fall of 2003, Mr. Hickman identified an open Medical Support Assistant position in the Outpatient Records department and forwarded the position description to Ms. Shepard [Dkt. #9-3, p. 9]. Ms. Shepard then met with the Outpatient Records supervisor, Pricilla Taylor, and visited the office to observe the work to be performed and the work environment [Dkt. #9-3, p. 9].

---

[1] To describe the working relationship that developed between these two women over the course of several years as "contentious" would be a monumental understatement. Indeed, Ms. Shepard has flooded the record with documents illustrating what she views as harsh, humiliating, and even cruel treatment at the hands of Ms. Ungren. However, the the extent that Ms. Shepard's present discrimination claims are not based on Ms. Ungren's behavior, the Court will not recite the events surrounding Ms. Shepard's previous hostile work environment claims.

ORDER
Page - 2

Ms. Shepard eventually accepted a transfer to Outpatient Records, which became effective December 28, 2003. The Outpatient Records job was at the same grade, step, and salary as Ms. Shepard's position in General Surgery [*Id*. at 1]. However, while the duties were similar between the two positions, the job at Outpatient Records was apparently more physically demanding [*Id*. at 11].

The parties dispute exactly what was communicated between the parties leading up to Ms. Shepard's eventual transfer to Outpatient Records. Ms. Shepard claims that she explicitly informed Mr. Hickman that she could not perform the work in Outpatient Records due to her BCTS [Dkt. #15-1, p. 2]. Mr. Hickman denies this, claiming that he was never notified of Ms. Shepard's BCTS prior to her transfer and was actually restricted from obtaining Ms. Shepard's medical history by the Health Insurance Portability Prevention Act ("HIPPA") [Dkt. #9-3, p. 10]. Ms. Shepard also claims that Mr. Hickman tricked her into accepting the transfer by assuring her that the transfer was only temporary [Dkt. #15-1, p. 2].[2] Mr. Hickman states that he never represented to Ms. Shepard that the move to Outpatient Records was temporary [*Id*. at 11].[3] (However, Ms. Taylor states that it was her impression that the move was temporary and that she likely communicated this belief to Ms. Shepard at some point [Dkt. #9-3, p. 31]). Finally, Ms. Taylor states that she explicitly asked Ms. Shepard whether she had any limitations prior to her transfer to Outpatient Records and was told "no" [Dkt. #9-3, p. 30]. However, Ms. Shepard claims that she was not asked about any disabilities or limitations during her visit to Outpatient Records but "would have told [Ms. Taylor]" if asked [Dkt. #15-3, p. 3]. Ms. Shepard also states that she "knew [she] couldn't do the work [at Outpatient Records], and did not want to go there" [*Id*.].

Despite the inconsistencies between the statements, the record contains ancillary evidence of communications that occurred both before and after Ms. Shepard's transfer. First, a series of e-mail

---

[2] Ms. Shepard presents somewhat conflicting evidence to support this claim. Ms. Shepard includes a statement from a union representative who states that he was given the impression that Ms. Shepard's transfer to Outpatient Records was permanent after discussing the transfer with Mr. Hickman [Dkt. #15-1, p. 8]. In contrast, Ms. Shepard also provides an e-mail from a co-worker in Outpatient Records, sent on March 23, 2004, that suggest Mr. Hickman indicated the transfer was to be a temporary [Dkt. #15-2, p. 16].

[3] While there is some evidence in the record that Ms. Ungren may have inappropriately obtained a copy of Ms. Shepard's medical records, there is nothing in the record before the Court (other than Ms. Shepard's statements) to indicate that anyone involved in Ms. Shepard's transfer was aware of her BCTS at the time of the transfer.

ORDER
Page - 3

exchanges between Mr. Hickman and Ms. Shepard (dating from December 2003), shed some light on the circumstances and representations as they existed before the transfer. To begin with, on December 4, 2003, Mr. Hickman sent an e-mail message to Ms. Shepard entitled "LATERAL TRANSFER" [Dkt. #15-2, p. 13]. In the e-mail, Mr. Hickman stated: "I still needed to know if you will consider a move to Outpatient Records"; Mr. Hickman went on to state that "[a] move to Outpatient records would have no effect on your ability to be considered [for other positions] but I also want to make sure that you have an opportunity to move out of the hostile environment you are currently in." [Dkt. #15-2, p. 13].

Ms. Shepard's response to this message came on December 10, 2003, where she expressed concerns about the hours she would need to work (for facilitating the commute with her husband) and whether the move would affect her chances of being considered for other positions [Dkt. #15-2, p. 14]. She also stated that she was feeling "just a little leery right now." [*Id.*]. Mr. Hickman replied later that afternoon and assured Ms. Shepard that he would make sure the working hours were as she requested and reaffirmed that "[a] move of this type will have absolutely no effect on your ability or changes [sic] of being considered for other positions." [*Id.*].

On December 11, 2003, Ms. Shepard replied to Mr. Hickman's prior e-mail and again expressed concerns about the permanence of the position, asking Mr. Hickman to verify that the move was "temporary and not a permanent position." [Dkt. #11-11, p. 3].[4] In response, Mr. Hickman sent the following message:

> Lana – if we were to make a move of this type [i]t would be permanent [i]n the sense that you could not return to General Surgery. On the other hand, it would not be permanent in the sense that if you applied for and were selected for another position at the SARP [Substance Abuse Rehabilitation Program] or [i]n Internal Medicine you could move to that position.

[*Id.*].

Next, in addition to the electronic correspondence with Ms. Shepard prior to the transfer, the record also shows that Mr. Hickman spoke with Ms. Shepard's local union representative, Lawrence

---

[4] As a point of clarification, Plaintiff encountered difficulty in her first attempt to electronically file documents in support of her opposition brief, and the Court requested that she re-file the documents. However, some of the materials did come through on the first attempt, including the e-mail exchange of December 11, 2003. This exchange was apparently inadvertently excluded in the re-filing process; thus, the Court will cite to the original filings for this material as necessary.

Kalcso. Mr. Hickman informed Mr. Kalcso of the plan to transfer Ms. Shepard to Outpatient Records [Dkt. #15-1, p. 7]. Mr. Kalcso was apparently aware of Ms. Shepard's BCTS and was skeptical of the suitability of the work at Outpatient Records to someone with Ms. Shepard's condition [*Id.*]. However, because of HIPPA requirements, Mr. Kalcso was prohibited from sharing this information with Mr. Hickman and, instead, simply advised Mr. Hickman to ask Ms. Shepard whether there would be any problems with her going to Outpatient Records [*Id.*].

Finally, e-mails between Mr. Hickman and Ms. Shepard *following* her transfer to Outpatient Records are also instructive. On January 13, 2004, just over two-weeks into her new employment, Ms. Shepard sent Mr. Hickman a message titled "Job Applications" in which she complained that she was "feeling like a fish out of water" and was "not using any of the skills [she] was trained for, or have used in the last 14 years." [Dkt. #15-2, p. 2]. Ms. Shepard also inquired about the status of a job she had applied for in Internal Medicine [*Id.*]. On February 10, 2004, Ms. Shepard sent Mr. Hickman another message stating her desire to transfer into another position and noting problems with her hands:

> Mr. Hickman, I would like some information on how to put in for a lateral transfer to the GS4 position that is now open in SARP at PSNS [Puget Sound Naval Shipyard]. I heard today that a GS4 quit and I know I am qualified for this position. Since I have 13 years in Civil Service and I want to work at PSNS, I would like to transfer. Do I have to put in a job application again? My resume has been hand carried to SARP and I know it was a GS5 which probably would put me out of the running, but I am a GS4 and I really would like to try for this. In the two months I have been down in out patient records, my hands are starting to become numb, I find that this is far harder on my hands than office work. I had carpal tunnel surgery in 1994 and I have had no trouble with them until this last month.

[Dkt. #15-2, p. 3]. In response, Mr. Hickman assured her that if the SARP Program Director felt that she was qualified for the position, a lateral transfer could be negotiated [*Id.*].

On February 24, 2004, Mr. Hickman contacted Ms. Shepard's supervisor, Ms. Taylor, regarding Ms. Shepard's medical issues [Dkt. #15-2, p. 4]. Mr. Hickman recommended that an ergonomic evaluation be performed on Ms. Shepard's workstation and that medical documentation be obtained in order to determine whether an accommodation was required or whether it should be suggested that Ms. Shepard apply for a disability retirement [*Id.*].

Ms. Shepard made her initial contact with an EEO counselor on February 18, 2004, and alleged the following: " Based upon retaliation for causing a legal investigation into my hostile work

environment and harassment in the work place, I was reassigned to a position in the file room" [Dkt. #9-3, p. 47].[5] In a March 24, 2004, letter to Ms. Shepard, the EEO counselor concluded that the transfer was not retaliatory but was the result of the administrative investigation of Ms. Shepard's FECA claim and her "repeated requests" for a transfer [*Id*.]. Ms. Shepard then filed her formal complaint on April 7, 2004 [Dkt. #9-3, p. 49]. In her formal EEO complaint intake form, dated April 1, 2004, Ms. Shepard listed "December 2003" as the date of the most recent alleged discrimination. The following allegation was accepted for investigation:

> As a result of your physical condition (carpel tunnel syndrom), and reprisal based upon the finding of a previous EEO complaint (3 September 2003), Ms. Lana Shepard claims she was discriminated against when she was reassigned from the position of Medical Support Assistant in the General Surgery department to the position of Medical Support Assistant in Outpatient Records.

[*Id*.].

When the EEOC ultimately rejected Ms. Shepard's complaint (without a hearing) on procedural grounds [Dkt. #9-3, pp. 51-77], Ms. Shepard initiated the present action, claiming retaliation and discrimination in violation of 42 U.S.C. § 2000e ("Title VII") and 29 U.S.C. § 701 ("the Rehabilitation Act").

## II.  STANDARD FOR EVALUATING THE MOTION

As an initial matter, the Court must determine the standard to be applied to Defendant's motion. Defendant's attack is two-pronged. Defendant first asserts that Ms. Shepard failed to exhaust her administrative remedies by not seeking EEO counseling within the mandated 45-day window (see discussion *infra*). As a result, Defendant moves for dismissal based on lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6) [Dkt. #9, p. 1]. Alternatively, Defendant moves for summary judgment pursuant to Fed. R. Civ. P. 56(c), claiming that Defendant is entitled to judgment as a matter of law.

It is well established, however, that the timely filing of an EEOC charge is not a jurisdictional

---

[5] Interestingly, in a May 21, 2004, letter from the EEO counselor, the "[d]ate of alleged discriminatory event" is listed as "13 February 2004" [Dkt. #15-1, p. 41]. However, in the same document, the "Allegation of Discrimination" is described as "when [Ms. Shepard] was reassigned" [*Id*.]

ORDER
Page - 6

prerequisite to suit.[6] *See Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982). Instead, the forty-five-day time limit to bring a grievance to an EEO counselor is treated as a statute of limitations and is thus subject to waiver, estoppel, and equitable tolling. *See Boyd v. U.S. Postal Service*, 752 F.2d 410, 414 (9th Cir.1985). As such, the issue cannot be resolved on a 12(b)(1) motion but should be treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Mallard Automotive Group, Ltd. v. United States*, 343 F.Supp.2d 949, 954 (2004) (citing *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89 (1990)). Because Rule 12(b)(1) is inappropriate and because Defendant has introduced matters outside the pleading in support of his motion, the Court will treat Defendant's entire motion as one for summary judgment. *See* Fed. R. Civ. P. 12(b).

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the

---

[6] The Ninth Circuit has held that failure to substantially comply with the appropriate administrative procedures *does* operate as a jurisdictional prerequisite. *See, e.g., Sommatino v. U.S.*, 255 F.3d 704, 708 (9th Cir. 2001). However, Defendant does not argue that Mr. Shepard's actions following her December 28, 2003, transfer were not in substantial compliance with the regulatory mandates.

nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### III.  DISCUSSION

**A.     Exhaustion of Administrative Remedies**

Federal employees must exhaust all available administrative remedies in order to bring a discrimination claim. *Cherosky v. Henderson*, 330 F.3d 1243, 1245 (9th Cir. 2003). Specifically, an employee who believes that he or she has been discriminated against "must consult [an EEO counselor] prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). When a personnel action is involved, such contact must occur "within 45 days of the *effective date of the action*." 29 C.F.R. § 1614.105(a)(1) (emphasis added).

As noted, this time limit is treated as a statute of limitations and is therefore subject to waiver, estoppel, and equitable tolling. *Boyd*, 752 F.2d at 414. However, these doctrines are to be applied sparingly, and courts should be wary of disregarding the procedural requirements established by Congress for gaining access to the federal courts. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002) (quoting *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984) (per curiam)). Thus, in the absence of special circumstances, failure to comply with the mandated timelines "is fatal to a federal employee's discrimination claim." *Cherosky*, 330 F.3d at 1245 (quoting *Lyons v. England*, 307 F.3d 1092, 1105 (9th Cir. 2002)).

**1.     Plaintiff's failure to seek EEO counseling within forty-five days of her transfer**

Defendant argues that Ms. Shepard is barred from bringing her claims in federal court because she failed to seek EEO counseling within the requisite time period. Specifically, Defendant asserts that the clock began ticking for Ms. Shepard immediately following the effective date of the personnel action she claims as retaliatory (i.e., the December 28, 2003, transfer to Outpatient Records).

It is indeed undisputed that Ms. Shepard did not seek EEO counseling until fifty-two days after she was transferred. While this span of time is certainly not exorbitant (just seven days over the forty-

five day limitation), Plaintiff points to no authority to suggest that the Court may simply waive this requirement in the absence of mitigating circumstances.[7] Additionally, as Defendant points out, courts have often applied the time limitations for seeking EEO counseling or filing formal EEO complaints in a manner that produces harsh results. *See, e.g., Boyd*, 752 F.2d at 414 (dismissal based on plaintiff's failure to seek EEO counseling until nineteen days after thirty-day time limit); *Wilkins v. Daley*, 49 F. Supp. 2d 1, 2 (D.D.C. 1999) (dismissal based on failure to file formal EEO complaint until five days after fifteen-day time limit). Consequentially, Ms. Shepard's failure to seek EEO counseling within the requisite time period is fatal to her claims unless she can establish the existence of mitigating circumstances under the doctrines of waiver, estoppel, or equitable tolling.

### 2. Estoppel and equitable tolling

Ms. Shepard asserts that relief from strict construction of the time limitation is justified under the doctrine of equitable tolling. Specifically, Ms. Shepard claims that the start of the forty-five-day period in which to seek EEO counseling should be tolled to late February 2004 (presumably when Ms. Shepard learned that her transfer to Outpatient Records was permanent) because she was tricked by Mr. Hickman into believing that the transfer was only temporary. This argument more closely resembles a claim of equitable estoppel; thus, the Court will examine the circumstances surrounding Ms. Shepard's transfer under both doctrines.

Equitable tolling is generally applied "to excuse a claimant's failure to comply with the time limitations where she had neither actual nor constructive notice of the filing period." *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002) (citation omitted). Thus, the focus in equitable tolling is on the reasonableness of a plaintiff's delay: "If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information [she] needs." *Id.* (citing *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000)). "However, once a claimant retains counsel, tolling ceases because she has gained the means of knowledge of her rights and can be

---

[7] While not cited by Plaintiff, an unpublished decision from the Northern District of California shows that at least one court has chosen to waive the time limit requirements where the deadline was missed only by a matter of days. *See Kushner v. Glickman*, 1997 WL 419402 (N.D.Cal.). However, the Court is satisfied that this case does not raise the concerns at issue in *Kushner*. Namely, unlike the plaintiff in *Kushner*, Ms. Shepard had previously sought EEO counseling and filed formal EEO complaints and was represented by an attorney at the time she was transferred.

charged with constructive knowledge of the law's requirements." *Id.* (quoting *Leorna v. U.S. Dept. of State*, 105 F.3d 548, 551 (9th Cir. 1997)) (internal quotation marks omitted).

By contrast, equitable estoppel focuses on the conduct of the defendant. Specifically, equitable estoppel comes into play where the defendant has taken "active steps to prevent the plaintiff from suing in time - a situation that the Seventh Circuit terms 'fraudulent concealment.'" *Id.* (internal citation and quotation marks omitted). "Fraudulent concealment necessarily requires *active conduct* by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent a plaintiff from suing in time." *Id.* (quoting *Santa Maria*, 202 F.3d at 1177) (emphasis added). A plaintiff must also show actual reliance on the defendant's conduct or representations and that the reliance was reasonable. *Santa Maria*, 202 F.3d at 1176.

Based on the totality of the record, the Court is satisfied that Ms. Shepard has not established circumstances requisite to justify extending the statute of limitations based on either equitable tolling or estoppel.

As to equitable tolling, the record establishes that Ms. Shepard had constructive, if not actual, notice of the requisite procedural requirements and that, while she may have been informed by Ms. Taylor that the transfer was temporary, Ms. Shepard had more than adequate notice of the possibility of a claim. First, and most critically, Ms. Shepard was represented by counsel at least as early as December 17, 2003, almost two weeks before her transfer to Outpatient Records took place [*See* Dkt. #15-4, p. 1]. As a result, equitable tolling does not excuse Ms. Shepard's failure to follow procedural requirements because she gained the "means of knowledge of her rights" even before she was transferred and can be charged with constructive knowledge of the law's requirements.

However, even without legal representation, a reasonable person in Ms. Shepard's position would have known that the time limit for seeking EEO counseling would have begun immediately following the transfer. Ms. Shepard's own statements establish that she did not want to go to Outpatient Records in any capacity and felt that she was the victim of a "squeeze play" effort to force her there [*See* Dkt. #15-3, p. 3]. Regardless of the position's permanence, Ms. Shepard should have known, *at the time of the transfer*, that her cause of action had accrued and that the clock was ticking. Finally, because Ms. Shepard had previously sought EEO counseling and had filed a formal EEO complaint based on Ms. Ungren's behavior, there is an additional inference that Ms. Shepard should be

charged with constructive knowledge of what was required to preserve her rights. Consequentially, Ms. Shepard's equitable tolling argument must fail.

Equitable estoppel presents a somewhat more difficult question. Indeed, the Court is troubled by what appears to be, at best, a glaring lack of communication between Human Resources and Outpatient Records regarding Ms. Shepard's transfer. Specifically, it is undisputed that Ms. Shepard's supervisors in Outpatient Records were under the impression that Ms. Shepard's transfer was temporary and likely communicated this information to Ms. Shepard at some point. Such evidence provides at least some indication that Ms. Shepard received mixed signals regarding the true nature of her new position. However, based on the totality of the record, the Court is satisfied that the Hospital's actions, while certainly not a model of employer/employee relations, do not rise to the level of the active, *fraudulent* conduct necessary to trigger the extraordinary application of equitable estoppel.

To begin with, and far from establishing any active conspiracy, the record exhibits an *absence* of concealment on the part of the Hospital's H.R. staff regarding the nature of Ms. Shepard's transfer. Most notably, the e-mail exchanges between Mr. Hickman and Ms. Shepard in the weeks leading up to the transfer provide clear evidence that Ms. Shepard was informed of the nature of the transfer. Based on any rational reading of the December 11, 2003, e-mail from Mr. Hickman, it is evident Ms. Shepard was told that the move to Outpatient Records was permanent until she *applied and was selected for another position*. Insofar as she construes this message as an affirmative guarantee of a short stay in Outpatient Records, Ms. Shepard's reading is unreasonable. While the conflict of this evidence with the representations by Outpatient Records staff may indicate a lack of care on the part of Mr. Hickman, the evidence significantly undermines Ms. Shepard's assertion of any fraudulent concealment on the part of Hospital staff.

Next, Ms. Shepard's own documentation shows that she did not actually rely on any of the representations (from Mr. Hickman or others) in formulating her retaliation claim. Specifically, Ms. Shepard's EEO counseling intake form reveals that her overwhelming concern in the early part of 2004 was being passed over for other transfers that she felt qualified for, not that she had been promised a quick removal from Outpatient Records [*Id*. at pp. 31-33]. Indeed, Ms. Shepard stated that the retaliatory action was being "*sent* to Outpatient Records"; she also made no reference to being

tricked into accepting the transfer [*Id.*] (emphasis added). Additionally, in her formal EEO complaint filed in April 2004, Ms. Shepard stated that the most recent discrimination had occurred in December 2003, *not* February 2004 [Dkt. #15-1, p. 59]. The question that was eventually accepted for formal investigation related to Ms. Shepard's December 2003 transfer. Because this evidence establishes that Ms. Shepard's focus, from the earliest stages of her retaliation complaint, centered on her transfer to Outpatient Records, Ms. Shepard cannot establish that she relied on the Hospital's representations even if its motivations were improper. As a result, Ms. Shepard's cannot establish that the Hospital should be equitably estopped from asserting the protection of the statute of limitations.

Because Ms. Shepard cannot establish that equitable tolling or equitable estoppel excuse her non-compliance with the time limitation, her discrimination and retaliation claims are untimely and must therefore be DISMISSED.

**B.     Intentional Infliction of Emotional Distress**

Defendant advances several theories for the proposition that Ms. Shepard's intentional infliction of emotional distress claim must be dismissed. Primarily, Defendant asserts that Ms. Shepard's emotional distress claim is unavailing because Title VII and the Rehabilitation Act provide the exclusive remedy for federal employment discrimination claims. Defendant also argues that Ms. Shepard's emotional distress claim is barred by the Federal Tort Claims Act (FTCA) because she has not filed an SF-95 administrative tort claim with the Navy (a jurisdictional prerequisite to filing suit under the FTCA). *See* 28 U.S.C. § 2675(a). Finally, Defendant asserts that the Civil Service Reform Act (CSRA), which provides a remedial scheme for federal employees to challenge "prohibited employment practices," preempts Ms. Shepard's tort claim.

In her opposition brief, Ms. Shepard addresses these arguments only by claiming that a Title VII/Rehabilitation Act plaintiff's ability to obtain damages for intentional infliction of emotional distress is "well settled."[8] Despite Ms. Shepard's claim to the contrary, however, the Court is satisfied that Ms. Shepard's emotional distress claim must be dismissed.

The Supreme Court has held that Title VII provides the exclusive remedy for a federal

---

[8] In support of this assertion, Ms. Shepard's legal counsel cites to *Kroske v. U.S. Bank Corp.*, 432 F.3d 976 (9th Cir. 2005), a *private* employer discrimination case that does not remotely stand for the proposition for which it is cited.

ORDER
Page - 12

employee's discrimination claims. *See Brown v. General Services Admin.*, 425 U.S. 820, 835 (1976). Likewise, because the Rehabilitation act relies on Title VII for its remedies and procedures, the Rehabilitation Act provides the exclusive remedy for a federal employee's discrimination claims based on handicap. *See Boyd*, 752 F.2d at 413. Thus, Ms. Shepard is barred from bringing her emotional distress claim insofar as it is based on the same factual predicate as her discrimination claims.

However, the Ninth Circuit has held that because "highly personal wrongs, such as defamation, harassing phone calls, and physical abuse" constitute "more than ... discrimination," Title VII is not the exclusive remedy for federal employees who suffer such wrongs. *Brock v. United States*, 64 F.3d 1421, 1423 (9th Cir. 1995) (internal citations and quotations omitted). While her claim for intentional infliction of emotional distress is far from well defined, Ms. Shepard's complaint alleges a broad range of activity falling outside the scope of her discrimination claims. Specifically, both in her complaint and in her opposition brief, Ms. Shepard alleges numerous instances of conduct, by Ms. Ungren and others, that, if true, seemingly fall within the category of "highly personal wrongs." As discussed below, however, the Court need not address this issue because any potential tort action is barred by Ms. Shepard's failure to follow the procedural requisites of the FTCA.

The general rule with regard to claims brought against the federal government is that "the United States cannot be sued at all without the consent of Congress[.]" *Block v. North Dakota ex. rel. Board of University and School Lands*, 461 U.S. 273, 287 (1983). While Congress has consented to suit for claims arising out of conduct such as that alleged by Ms. Shepard, the FTCA requires that an administrative claim be filed with the responsible federal agency prior to filing a lawsuit against the United States under the Act. *See* 28 U.S.C. § 2675(a). There is nothing in the record to indicate that Ms. Shepard has adhered to the procedural requirements mandated by the FTCA. Consequentially, this Court does not have jurisdiction over Ms. Shepard's claim for intentional infliction of emotional distress, and the claim must therefore be DISMISSED.

### III. CONCLUSION

It is hereby ORDERED that Defendant's Motion to Dismiss and/or for Summary Judgement, Dkt. # 9, is GRANTED. The clerk shall enter judgment for the defendant on all of plaintiff's claims.

DATED this 19th day of October 2007.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE